**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HECTOR JAQUEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04 C 0171 |
| | ) | |
| vs. | ) | District Judge Guzman |
| | ) | |
| JO ANNE B. BARNHART, | ) | Magistrate Judge Schenkier |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

The present case involves an appeal from the Social Security Administration's ("SSA")

denial of disability benefits to the plaintiff, Hector Jaquez, under Sections 405(g) and 416(i) of the

Social Security Act, 42 U.S.C. § 405(g), 416(i) (2004). The parties' cross-motions for summary

judgment (doc. ## 10, 14) have been referred to this Court for a report and recommendation (doc.

# 16). After review of the record, this Court recommends that the presiding district judge grant Mr.

Jaquez's motion for summary judgment (doc. # 10), deny the Commissioner's cross motion for

summary judgment (doc. # 14), and remand this case to the SSA, pursuant to Sentence 4 of 42

U.S.C. § 405(g), for further proceedings consistent with this opinion.

## I.

We will begin with the procedural history of this case. Mr. Jaquez applied for disability

insurance benefits ("DIB") on April 7, 1993 (R. 31), alleging that he became disabled on December

13, 1990, as a result of being unable to work due to back, leg and shoulder pain (R. 32, 116, 120,

146).[1] Following denials of his application by the SSA, both initially and on reconsideration, the ALJ issued an opinion, dated September 25, 1996, denying Mr. Jaquez's claim for benefits (R. 31). Mr. Jaquez appealed that decision to the Appeals Council (R. 31). In an order dated November 1, 1999, the Appeals Council remanded the case back to the same ALJ for a *de novo* hearing, because the tape recording from the hearing, at which Mr. Jaquez testified prior to the ALJ's written decision, had been lost and the record therefore was incomplete (R. 575-76).

During the further proceedings before the ALJ on remand, Mr. Jaquez amended his disability application to revise his onset date to August 21, 1992, and to request a closed period of benefits for the period from August 21, 1992 to April 6, 1997 (R. 61, 63, 70). On October 5, 2001, the ALJ held a new hearing, at which Mr. Jaquez testified with his attorney present (R. 58-115). The ALJ also received testimony from a medical expert ("ME"), Dr. William Newman, an orthopedic surgeon, and a vocational expert ("VE"), GleeAnn Kehr (R. 98-113). Based on this testimony, as well as the other evidence in the record, the ALJ issued a second written opinion, dated July 2, 2002, denying disability insurance benefits to Mr. Jaquez for the closed period (R. 31-44). On December 11, 2003, the Appeals Council denied Mr. Jaquez's appeal of the ALJ's decision (R. 9-11), making this decision the final decision of the Commissioner. 20 C.F.R. §§ 404.955, 404.981 (2003). Having exhausted his administrative remedies, Mr. Jaquez then filed a complaint in this Court, on January 9, 2004, seeking review pursuant to 42 U.S.C. § 405(g).

---

[1]Mr. Jaquez also claims that he was disabled due to depression (an affective disorder) and somatoform disorder, both resulting from his pain (Pl.'s Mem. at 2). Although depression and somatoform disorder were not expressly alleged in the application for benefits (R. 120), Mr. Jaquez raised these claims for disability before the ALJ, on administrative appeal, and in this appeal. Moreover, the ALJ addressed these claims in his disability finding, and the government has not asserted that Mr. Jaquez has waived these claims of disability. Thus, we consider these claims for disability to be a part of the case, and address them in this opinion.

## II.

The relevant factual history contained in the record is as follows. Mr. Jaquez was born on October 20, 1961 (R. 64). From 1987 through September 1992, he was employed as an airline ramp agent for American Airlines (R. 73-74, 150). This job required him to be able to handle and lift luggage weighing up to 70-75 pounds (R. 73-74, 150). During that time, Mr. Jaquez also worked as a warehouse clerk for American Airlines, building cargo pallets that go on the planes, driving forklifts, and lifting up to 70-75 pounds (R. 75, 150).

On December 13, 1990, while he was working at O'Hare airport on a ramp, Mr. Jaquez hurt his back. Specifically, he was tying down cargo pallets and "helping to tighten straps to cover [the] pallets," when "the strap broke and [Mr. Jaquez] fell backwards, hit a parked van, fell down, and blacked out" (R. 327, 389). A letter dated December 4, 1995, from Frederick Daley, Mr. Jaquez's attorney in the first administrative proceeding, summarizes the injury and subsequent events up to the alleged disability onset date of August 21, 1992:

> Claimant was taken to the hospital, where X rays were taken. Claimant was instructed by the doctor in the emergency room to remain off of work for a few days. Claimant was diagnosed as having a "lumbosacral sprain and a dorsal sprain." Due to persistent pain in his lower back with radiating pain into his right leg, a CT Scan of lumbar spine was done on December 17, 1990, which revealed mild bulge involving several discs. After examining Claimant on January 7, 1991, Dr. Charles W. Mercier, M.D. diagnosed Claimant as having "Acute Lumbosacral Strain."

> Claimant stated that he had attempted to return to work several times since the injury in 1990. However, these attempts were unsuccessful and lasted only for a couple of hours at a time because of the increased pain in his lower back. After reviewing Claimant's pay stubs in 1991 and 1992, an SSA personnel determined that "based on pay stubs provided, Claimant worked 6/91-7/91, 10/91-1/92, 4/92-5/92, and 7/92-8/92. All periods of work are unsuccessful work attempts.

3

Claimant attempted to return to his old job on August 21, 1992. He lifted a big box weighing about 150 pounds with two other people. Shortly thereafter, his pain became excruciating and he went to the Immediate Care Center. After an examination on August 24, 1992, Dr. Alvary found that Claimant had severe motion restriction, multiple trigger points, and deep tenderness over all of the supportive ligaments of the sacroiliac joint on the right [side] . . . .

(R. 389-90).

Dr. Alvary was Mr. Jaquez's treating physician from August 1992 through August 1993 (R. 389-90). During the closed period in which Mr. Jaquez seeks benefits, he was also examined by numerous other doctors both for pain and depression. We will review the medical evidence related to Mr. Jaquez's physical pain first, and then follow with the psychological reports.

## A.

Mr. Jaquez seeks benefits for a closed period of disability, alleging an onset disability date of August 21, 1992 through April 6, 1997 (the date he began to work again) (R. 32). Because his disability insurance status date ended on December 31, 1995 (R. 63, 129), the medical evidence must show the onset of a disability that meets the legal requirements for benefits between August 21, 1992 and December 31, 1995 – even if that disability continued throughout the alleged closed period, or April 6, 1997. Thus, although the record in this case contains numerous medical reports predating August 21, 1992 (*i.e.,* reports used by the ALJ and the SSA in the first proceeding), only those reports and medical evidence relevant to the alleged closed period of disability will be considered here. With that *caveat*, we will begin with the relevant historical fact of Mr. Jaquez's original injury to his back on December 13, 1990.

4

**1.**

As indicated, when Mr. Jaquez applied for DIB on April 7, 1993, he alleged constant pain in his right leg, lower back, and right shoulder blade, as well as lumbosacral strain, with an alleged onset date of August 21, 1992 (R. 32). The pain, however, originated from an injury that occurred at work on December 13, 1990, when he fell backwards (R. 34-35, 232). Persistent pain in his lower back kept Mr. Jaquez from returning to his former job as a ramp agent, but he performed light work intermittently for American Airlines from 1991 through August 21, 1992 (R. 159).[2]

After the 1990 injury, Mr. Jaquez was sent by American to a "work-hardening" program (R. 295), where he showed minimal improvement (R. 225). He also had an operative procedure performed on his back by his treating physician, Dr. Alvary, on August 17, 1992, based on a diagnosis of "right sacroiliac joint instability"; Mr. Jaquez showed signs of physical improvement immediately after the operation (*i.e.,* according to Dr. Alvary, Mr. Jaquez "left the area in good condition" and "walked around, sat, jumped and ran, none of which he could do before") (R. 468). On August 21, 1992, at the urging of American's "company doctor," but against the advice of his treating doctor (Dr. Alvary had only released him to sedentary work), Mr. Jaquez returned to his former job as a ramp agent (R. 308). That same day, Mr. Jaquez (with the assistance of two other people) lifted a large box weighing about 150 pounds onto a pallet (R. 308). Shortly thereafter, Mr. Jaquez reported "excruciating" pain in his back (R. 308).

---

[2]Apparently, during that intermittent period of work at American, Mr. Jaquez injured himself again on May 12, 1992, when he fell back on his right buttock (R. 317). After this incident, he was strongly encouraged by American to go back to his former job as a ramp agent, but no work hardening was ordered, and Mr. Jaquez could not perform the exertional requirements of the job, so American gave him light work duty until August 1992 (R. 158-59).

One SSA daily activities report indicates that American Airlines, Mr. Jaquez's employer, fired him (R. 175). The ALJ also found that Mr. Jaquez was fired, based on Mr. Jaquez's testimony (R. 33). But, despite that apparent termination, American continued to solicit from Dr. Alvary medical updates on the progress and condition of Mr. Jaquez as late as July 27, 1993 (R. 500-01). That would suggest that Mr. Jaquez may have been on a period of leave, and was not terminated.

And, it is not clear whether Mr. Jaquez was ever released by Dr. Alvary to return to work at American (Compare R. 493 (no release for work as of 8/24/92) with R. 480 (release for light work as of 7/9/93) with R. 500-01 (no release for work, not even sedentary work as of 7/23/93)). The medical evidence also shows that on August 24, 1992, an examining physician from Northern Illinois Medical Associates recommended to Mr. Jaquez that he should not return to work if no sedentary job was available, because to do so (given his condition) might be "injurious to his health" (R. 308).

Whether Mr. Jaquez went on an extended period of leave from American or was fired, Mr. Jaquez did not return to – work at American or anywhere else – after the August 21, 1992 injury, the alleged onset date of his disability, until April 6, 1997, the end of the closed period asserted by Mr. Jaquez (R. 32).

**2.**

The medical evidence post-dating the August 21, 1992 "re-injury" and preceding the December 31, 1995 disability insurance status date is as follows. On August 24, 1992, Dr. Alvary, the treating physician, indicated that "no work" was possible for Mr. Jaquez due to his physical condition at that time (R. 493). On that same date, an examining doctor indicated that Mr. Jaquez required "definitive treatment" for his back due to excruciating pain with "severe motion restriction,

6

multiple trigger points, and deep tenderness over all of the supportive ligaments of the sacroiliac joint on the right" side (R. 308).

In a letter dated October 27, 1992, Dr. Alvary wrote that Mr. Jaquez was "disabled from his job," because "it is impossible for him to put weight on the affected side, whether sitting or standing without pain" (R. 476). Dr. Alvary continued to treat Mr. Jaquez through August 1993, and in a July 27, 1993 letter to Dr. Nestor Kowalsky, the Area Medical Director for American Airlines, Dr. Alvary stated:

> The reason I don't believe Mr. Jaquez can work is that he cannot put any weight on the right side of his pelvis and lower extremity, whether he sits or stands. He also presents a typical sacroiliac joint history of having "to be on the move" i.e. **he needs to change his posture frequently**. He cannot lift, bend, play tennis, jog, run, or stand without changing posture . . . . A so-called "sedentary job" is really not suitable, as he cannot sit for more than a few minutes without having to get up. I last examined Mr. Jaquez on April 27, 1993, when his examination was the same as on the first day I saw him, [on August 10, 1992] . . . . The origin of his pain was demonstrated by a selective diagnostic right sacroiliac joint injection under fluoroscopic guidance. . . . I don't believe that Mr. Jaquez's complaints are exaggerated nor do I believe that they are out of proportion to the abnormal physical findings present. . . .

> Some physicians believe that the sacroiliac joint is "very stable" which is incorrect. There are no muscle attachments to the joint; it is held together entirely by ligaments and once these ligaments have been stretch-injured and become incompetent, they heal that way. The resulting instability of the joint persists permanently as it cannot correct itself . . . This type of sacroiliac joint dysfunction does not improve with time. **All ligaments have healed in the stretched position** eight weeks from the accident . . . . I expect this patient's **dysfunction** to **worsen with time.**

(R. 500-01 (emphasis added)).

Dr. Alvary also issued two work release forms between August 21, 1992 through July 1993. On August 24, 1992, Dr. Alvary wrote that Mr. Jaquez can perform "no work" (R.493). In a work release form dated July 9, 1993, Dr. Alvary released Mr. Jaquez to perform "light work" (R. 480). Inexplicably, this release precedes by fewer than three weeks Dr. Alvary's letter to Dr. Kowalsky, American's Medical Director (R. 500), in which Dr. Alvary offers the opinion that Mr. Jaquez cannot work at all.

From April 1994 through April 1995, Mr. Jaquez saw Dr. P. Hauser ten different times. Although Dr. Hauser, whom Mr. Jaquez refers to as a pain specialist (Pl.'s Mem. at 7-8), consistently reported that the claimant was doing "better" than he was at each previous examination, each treatment note also indicates that Mr. Jaquez was still in pain, for which the doctor prescribed daily doses of pain medication such as Vicodin and Hydrocortisone. Dr. Hauser also recommended exercise to help Mr. Jaquez both with movement and pain, and it appears from the treatment notes that Mr. Jaquez followed this advice (R. 355-58).

On March 27, 1995, Kevin Regan, a chiropractor, examined the claimant. After orthopedic and neurological tests were performed on Mr. Jaquez, in a report dated April 3, 1995, Mr. Regan noted that the claimant had "[s]evere tenderness and spasticities of the paraspinal muscles of the lumber spine" (R. 353). Mr. Regan diagnosed Mr. Jaquez as having "chronic post-traumatic lumbar

8

disc syndrome"[3] and "chronic lumbar myofascial pain syndrome"[4] (R. 353). Mr. Regan examined

Mr. Jaquez again on November 8, 1995. Upon physical examination, Mr. Regan observed:

> The usual orthopedic tests were performed on this patient. Severe tenderness of muscles was noted in the cervical, dorsal and lumbar paraspinal musculature. Flinching and splinting of muscles throughout this region was present upon palpation . . . . Lumbar extension was reduced by 50%, which created sharp spasms of the lumbar spinal musculature.

> Diagnosis:

> 1.  Chronic post-traumatic cervical and lumbar disc syndromes.
> 2.  Chronic severe Fibromyalgia of the cervical, dorsal and lumbar spinal musculature.

> Prognosis:

> Mr. [J]aquez's injury has developed into a chronic state which is difficult to treat as most therapies are transient at best in their effects. Mr. [J]aquez has a debilitating state of his posterior spinal soft tissues, resulting in neuro-muscular deficits. He has weakness in the lumbar spine, daily migraines, nerve impingement of the left upper extremity, restrictions in all cervical AROM's, and constant diffuse pain in all the spinal soft tissues. . . .

(R. 533-34). Mr. Regan concluded the report of this examination by stating: "it is my opinion that

his condition/disability is permanent and he is unemployable" (R. 534).

---

[3]"Disc Syndrome" (also called "Herniated Nucleus Pulposus"): Spinal vertebrae are separated by cartilaginous disks that consists of an outer annulus fibrosus and an inner nucleus pulposous. Degenerative changes (with or without trauma) result in protrusion or rupture of the nucleus through the annulus fibrosus in the lumbosacral or cervical area; the nucleus moves posterolaterally or posteriorly into the extradural space. Pain in the distribution of the compressed root may begin suddenly and severely, or insidiously . . . Muscles supplied by the impaired root eventually become weak, wasted, and flaccid. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY, p. 1515, 16th ed. (1990).

[4]"Myofascial Pain Syndrome" (also called "Fibromyositis") – termed under "Fibromyalgia": A group of common nonarticular rheumatic disorders characterized by achy pain, tenderness, and stiffness of muscles, areas of tension insertions, and adjacent soft-tissue structures. "Myositis" is due to inflammation of muscle tissues . . . . Onset of stiffness and pain frequently are gradual, diffuse, and of an "achy" character . . . . There may be local tightness or muscle spasm, though active contractions typically cannot be demonstrated by electromyography . . . Diagnosis is by recognition of the typical pattern of diffuse Fibromyalgia and nonrheumatic symptoms (*e.g.*, poor sleep, anxiety, fatigue, irritable bowel symptoms) . . . . THE MERCK MANUAL OF DIAGNOSIS AND THERAPY, p. 1369-1370, 16th ed. (1990).

Further, on the Physical Capacity Evaluation ("PCE") Form, dated November 7, 1995, Mr. Regan reported that Mr. Jaquez could sit, stand, or walk for up to 45 minutes "at one time" (R. 535-536). Mr. Jaquez could lift up to five pounds "occasionally" and "never" more than 5 pounds. He could also occasionally carry up to five pounds, but never more than that. Mr. Jaquez was "never" to crawl, climb or reach; and he could not use either of his hands for pushing and pulling or fine manipulation.

The record contains a report from an SSA consultant, Dr. Mehroo M. Patel, dated May 31, 1993. In his report, Dr. Patel observes that, upon physical examination, Mr. Jaquez "walks with normal gait when perceived unobserved, however stiffening up right knee and hip with gait transformed into a stiff-leg limp" (R. 324). Dr. Patel also noted that "[t]hough he sat normally in waiting room, in examining room he sat with right leg straight out at knee and hip. He was able to bend down and retrieve key he dropped (inadverten[t]ly) on the floor (R. 324). He was able to nego[t]iate steps up and down" (R. 324). Dr. Patel's objective medical measurements, however, were consistent with the reports of Dr. Alvary and Mr. Regan: Dr. Patel noted that Mr. Jaquez had "[s]ignificant myospasm in [the] lumbar area" and that "[m]ovements in [the] [l]umbar area [are] sever[e]ly limited . . . to: Flexion 30 degrees; Extension 10 degrees' [and] Rotation 20 degrees in both directions [with] lateral flexion 10 degrees" on both sides. It was only the lower limb movements that Dr. Patel found to be "voluntarily" inhibited (R. 325).

**3.**

We turn next to the psychological evidence of depression (an affective disorder) and somatoform disorder. As the ALJ stated: "[e]arly on, in an attempt to assess the claimant's mental impairment, a consultative psychiatric examination was performed on the claimant on October 4,

1993" (R. 37). In a report of that examination, Dr. Elouisa Dizon concluded that Mr. Jaquez had a somatoform disorder and a poor level of adaptive functioning in the past year. She also stated that Mr. Jaquez appeared "preoccupied with pain" and that "the pain this claimant experiences and reports seem to [be] much more severe than the medical findings." Dr. Dizon believed that Mr. Jaquez needed to "be motivated to undergo rehabilitation and vocational evaluation" (R. 330).

In January 1995, Dr. John Tirado, Ph.D., a psychologist with Midwest Psychological Associates, P.C., evaluated Mr. Jaquez at the request of the SSA. He performed various objective personality tests and conducted a diagnostic interview (R. 382). In this report of the evaluation dated January 9, 1995, Dr. Tirado assessed Mr. Jaquez's personality, primarily, and his intellectual abilities relative to the types of jobs he could perform. Dr. Tirado did not assess Mr. Jaquez's claims of depression as a source or symptom of disability (R. 382-87).

In May 1995, Dr. Hussain of the DuPage County Health Department evaluated Mr. Jaquez. Dr. Hussain concluded that claimant's thought content was "positive for" a sense of "worthlessness" and "hopelessness" with a "sad" affect, but "[n]o suicidal or homicidal ideations or plans" and "no delusions" (R. 418). Dr. Hussain concluded that it was "unclear how debilitating his back injury" was at that time, and that it was "likely that his depression and other situational stressors (marital conflict, etc)" had "made it difficult for him to fully function," and had "slowed down his physical and vocational rehabilitation" (R. 419). The diagnosis was major depression, recurrent, severe without psychotic features; alcohol abuse in partial remission; and a history of back injury (R. 419).

At a follow-up examination on June 2, 1995, Dr. Luckose Luke, a staff psychiatrist at DuPage County Health Department, reiterated Dr. Hussain's assessment, indicated that the claimant was

going to the health club and exercising 3-4 times a week, going to school and taking anti-depressants. The report recommended discontinued use of Paxil and use of small does of Zoloft (R. 405-06).

In July 1995, Mr. Jaquez received a follow-up examination by Dr. Polina Shvarts, a staff psychiatrist with the DuPage County Health Department. Dr. Shvarts discontinued the Zoloft because Mr. Jaquez was sleepy and drowsy, and she started Mr. Jaquez on Wellbutrin. She diagnosed Mr. Jaquez with the same conditions that Dr. Hussain indicated (R. 407-08). Dr. Shvarts later filled out several relevant forms, as well. On October 3, 1995, she completed a Psychiatric Review Technique form ("PRT") and a Mental Residual Functional Capacity Assessment ("MRFC Assessment"). The PRT indicates that Mr. Jaquez had an affective disorder, but his severe impairment was "not expected to last 12 months" (R. 430). Nonetheless, Dr. Shvarts indicated that, in her view, Mr. Jaquez exhibited "marked" limitations in daily living and social functioning, that he "often" had deficiencies of concentration, persistence or pace in completing tasks in a timely manner, and that he had continual episodes of deterioration or decompensation in work or work-like settings. However, in what appears to be a contrary assessment on the MRFC Assessment, Dr. Shvarts checked the "not significantly limited" box for understanding and memory, sustained concentration and persistence, social interaction or adaptation (R. 439-40). In a letter to Mr. Jaquez's attorney dated May 15, 1996, Dr. Shvarts indicated that her diagnosis was based on one interview, and she did not perform any objective tests to validate her opinions. She indicated that "[i]t would be fair to say that, based on my 'one time' interview with Mr. Jaquez, I may have 'insufficient evidence,' i.e. lack of objective test results, to make a complete mental assessment of Mr. Jaquez" and she denied the ability to give "an opinion about Dr. Kerr's psychological assessment of Mr. Jaquez" (R. 549).

Dr. Norman Kerr, Ph.D., A.B.P.P., licensed clinical psychologist, was the last mental health professional to examine Mr. Jaquez during the closed period. He issued a report, dated November 10, 1995, at the request of Mr. Jaquez's attorney (R. 509-515). Dr. Kerr is a member of the panel of experts who appear as medical experts at SSA hearing (R. 527). In his report, Dr. Kerr indicated that he had reviewed Mr. Jaquez's medical and non-medical records, and had used the following tests to evaluate the claimant such as the Minnesota Multiphasic Personality Inventory–II (MMPI–2); Cornell Psychiatric Index; Beck Depression Inventory; Bender Visual Motor Gestalt Test; Wide Range Achievement Test for Reading (R. 509). The following is an excerpt from Dr. Kerr's report:

> Personality Functioning: . . . An analysis of his clinical profile revealed him to be an emotionally unstable person whose defenses are down and who is beset with inner conflicts and psychological turmoil and interpersonal difficulties. His highest abnormal code was 34/43. Persons with this code are most frequently diagnosed as passive/aggressive personalities who are inwardly angry, markedly immature and egocentric, . . . discharge their anger in indirect, passive/aggressive ways . . . . Though outwardly appearing to be conforming, people such as Mr. Jaquez often have histories of episodic acting out followed by periods of inhibited or moderated behavior. Such persons are hypersensitive to criticism, and are tense and anxious as a result of repressed anger towards others . . . . [he] is chronically depressed, unhappy, tense, confused, markedly indecisive, and probably attempting to hold himself together via his somatic preoccupations to ward off a break with reality.

(R. 514).

Dr. Kerr also concluded that Mr. Jaquez met listings 12.04 ("Affective Disorders") and 12.07 ("Somatoform Disorders") on the Psychiatric Review Technique Form (R. 516). Besides having both "Affective Disorder" (diagnosis: mood disorder with depressive features due to the effects of his general medical condition) (R. 518), which is characterized by difficulty concentrating or thinking, and "Somatoform Disorder" (diagnosis: pain disorder associated with both psychological factors and/or general medical condition) (R. 520), Dr. Kerr stated that Mr. Jaquez also has "more

13

than 'Moderate' restriction of activities of daily living, 'Marked' difficulties in maintaining social functioning, and 'Continual' episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms" (R. 516, 522).

Furthermore, on the Mental Residual Functional Capacity Assessment form, Dr. Kerr stated that Mr. Jaquez has "Markedly Limited" ability in all of the following areas: the "ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; ability to respond appropriately to changes in work setting; and ability to set realistic goals or make plans independently of others." (R. 523-524).

### III.

We turn now to a summary of the administrative hearing and the ALJ's written decision. We begin with the hearing testimony.

### A.

At the administrative hearing, held on October 5, 2001, Mr. Jaquez and his attorney testified, together with a medical expert, Dr. William Newman, who is an orthopedist, and a vocational expert, GleeAnn Kehr (R. 58-115). The ALJ did not call a psychiatrist or a psychologist to testify at the hearing.

14

During the hearing, Mr. Jaquez testified to the following, relevant points:

1.　He started working again in April 1997, as a ramp serviceman for United, fueling planes and handling luggage (R. 65) on a 40-hour/week schedule (R. 65). The exertion level required lifting 70-75 pounds, as well as standing and walking all of the time (R. 69-70).

2.　Mr. Jaquez indicated that he had been injured at United since 1997, once in December 1999, when a heavy, frozen piece of luggage slid down a belt and hit him on the forearm, causing "some arthritis" in his right shoulder (R. 67-68). After that injury, he was placed on light duty (R. 69-72), and at the time of the October 5, 2001 hearing, his job involved fueling planes and scanning luggage (R. 65, 72).

3.　Mr. Jaquez testified that he received a workers' compensation settlement and part of his pay from American Airlines after the August 21, 1992 accident (R. 70-71), but it was not enough to support him, and his primary source of income was from his wife (R. 71).

4.　Mr. Jaquez then described what his job at American Airlines involved when he was a ramp agent and warehouse clerk (R. 73-75). He also testified about jobs he had prior to his work at American (*e.g.,* bartender, day worker/assembly line, inventory worker (R. 76-77)) – shuttle service, busboy and runner (R. 78-79). The ALJ asked him about the exertional requirements of those jobs (R. 80-81), which required lifting no more than 20 pounds and both standing and sitting.

5.　Mr. Jaquez then testified to reasons why he claimed disability due to back injury and pain (R. 81-87). In particular, he stated that he had lower back pain during the closed period, and he was treated by Dr. Alvary (R. 86). The treatment he received included injections and steroids (R. 84), exercise and work hardening (R. 85), and an operative procedure (*i.e.,* "Diagnostic right Sacroiliac joint injections under fluro-scopic guidance") by Dr. Alvary, an orthopedic surgeon (R. 468). On examination by his attorney (R. 93-96), Mr. Jaquez said that the back pain he experienced during the closed period made him unable to sit still for long periods of time, although he could stand for long periods (R. 93). He did have trouble lifting, bending and twisting (R. 96), and he was "home-ridden" (R. 95-96).

6.　Mr. Jaquez also testified to his mental problems (R. 87-90). Specifically, he stated that he had taken various anti-depressants, such as Prozac and Zoloft, and had experienced side effects such as "bad headaches" (R. 87). Mr. Jaquez discussed going to see psychologists at DuPage County Health Center and said that his visits "helped a lot" but "they wanted partial payments" so he stopped going. Then he went back to work in 1997, after injections from a "second doctor" in 1997, which

"helped" him and "got [him] back into work." He also said that his mental "condition got a lot better" after he returned to work (R. 90-91).

The medical expert, Dr. Newman, testified that the diagnoses by Drs. Alvary and Patel were in conflict, but he only described the diagnoses of Drs. Alvary and Mr. Regan. He testified that Mr. Regan diagnosed "chronic lumbar myofascial pain syndrome" and Dr. Alvary diagnosed "sacroiliac joint instability" (R. 100-01). He noted that Dr. Mercier's report "doesn't count, because we're talking about '92" and that there was no orthopedic surgeon or neurosurgeon report after August 1992 (although Dr. Alvary is an orthopedic surgeon) (R. 101).

Dr. Newman also indicated that there was no CAT scan or MRI or X-ray "demonstrating any displacement of the sacroiliac joint" and "no evidence of a specific neurological deficit." He concluded that "from an orthopedic standpoint" he could not "find anything that [he] could really say [was] positive medical evidence" (R. 102).

The ALJ then asked the ME to provide an opinion, based on the "objective medical evidence in the record" as to "the claimant's medical situation as of August 21, 1992 through April 6, 1997" (R. 102). The ME was asked to address the listings and the claimant's RFC; he did neither. The ME stated only that the file did not contain "positive" evidence "to demonstrate pathology" (R. 102).

The VE, Ms. Kehr, also testified. Ms. Kehr defined sedentary and light work as follows:

> Sedentary work would be work where the individual would be seated as much as six hours per work day and on their feet as much as two hours per work day, and would have maximum lifting of 10 pounds. Light would be where an individual would be on their feet as much as two thirds of the work day, lifting a maximum of 20 pounds occasionally and 10 pounds frequently.

(R. 105). She then reviewed the claimant's relevant work history and education, indicating that Mr. Jaquez had been performing medium to heavy work, exertionally, prior to his injury on the low-end

of semi-skilled with no transferrable skills (R. 106). Ms. Kehr then reviewed the exertional skill levels for his jobs prior his last job at American before the 1992 injury (R. 106-07).

The ALJ asked the VE to assume that a person could "meet the demands of sedentary and light work" (R. 107), and based on that assumption, to state what jobs a person with the claimant's age and education would be able to perform with the claimant's transferrable skills. Ms. Kehr said there would be "tens of thousands" of sedentary, unskilled jobs (R. 108). She then testified as to the types of jobs available, such as service, clerical and manufacturing, with the more simple jobs in manufacturing, which would also qualify as light work (R. 109).

On cross-examination, Ms. Kehr acknowledged that if Dr. Kerr's limitations were considered (*i.e.*, an inability to understand and remember details, maintain attention and concentration for extended periods, and perform activities within a schedule), those limitations "would preclude all substantial gainful activity" (R. 111). She also stated that if a person was off task more than 85 percent of the time, he could not perform light or sedentary work (R. 112-13).

## B.

In a written decision, dated July 2, 2002, the same ALJ who denied benefits to Mr. Jaquez in a written decision in 1996 denied benefits once again (R. 31-44). In his 2002 opinion, the ALJ explicitly incorporated the 1996 written decision denying benefits into the July 2, 2002 decision (R. 32). The ALJ explained that he did so, because the case had been "remanded solely for the reason that the Appeals Council had lost the tape of my first hearing" (R. 32). Noting that the 1996 decision "recounts the claimant's testimony at the first hearing and also reviews and summarizes the evidence which was of record at the time of that decision[,]" the ALJ incorporated the 1996 decision into his 2002 decision and referred to portions of that earlier ruling in explaining his 2002 decision (R. 32).

The ALJ began his evaluation of the evidence with the five-step sequential test for disability. Because there was no evidence that Mr. Jaquez had worked during the closed period, there was no basis for denying Mr. Jaquez benefits at Step 1 (R. 32-33). At Step 2, the ALJ determined that Mr. Jaquez had a "severe" impairment, which is defined as an impairment which significantly limits (has more than a minimal effect on) an individual's ability to perform basic work activities (R. 33). At Step 3, the ALJ determined that the severity of Mr. Jaquez's impairment did not meet or equal an impairment listed in Appendix 1 to Subpart P, Regulations No. 4 (the "listings" or a "listed impairment"). Specifically, the ALJ found that neither the lumbar sprain/musculoskeletal impairment claimed by Mr. Jaquez nor his depression met the relevant listings (*i.e.,* listings 1.00 *et seq.* for the lumbar sprain and listing 12.04 for depression) (R. 33). The ALJ indicated that the text of the opinion would explain the basis for this finding (R. 33). But, when we examine the text for the basis of this determination, the only reason given by the ALJ for finding that the listings were not met was that there were: (1) no physical objective findings which come close to meeting or equaling any of the musculoskeletal impairments in medical listings 1.00 *et seq.* (R. 33, 34); and (2) "the favorable mental assessments to the claimant have largely been the result of his subjective complaints." (R. 39).

With regard to depression, the ALJ found that:

[t]he findings of Drs. Shvarts and Kerr were based largely upon what symptoms the claimant complained of to those examiners. In order to fully assess the effects of the claimant's alleged depression upon his ability to work, the claimant's overall credibility must play a large role in determining the weight to be given to the favorable reports.

(R. 39). Because the ALJ found the claimant's testimony not to be credible, the ALJ found that "it must also follow that his subjective complaints of depression and functional limitations stemming from that disorder are also not fully credible" (R. 39).

The ALJ then moved to Step 4 of the sequential evaluation. There, he found that the claimant's "residual functional capacity" ("RFC") – *i.e.,* residual capacity to perform work in spite of work-related limitations stemming from the medically determinable, severe impairment – had to be established before proceeding further. The ALJ found that during the closed period of time under consideration, Mr. Jaquez had the RFC necessary to perform "light exertional work with the additional limitation of only unskilled, simple work" (R. 33).

Given this RFC, the ALJ proceeded to summarize the claimant's alleged symptoms, impairments and limitations. The ALJ drew from the claimant's testimony in the 1995 hearing (for which the tapes were lost), as well as the testimony he gave at the re-hearing on October 5, 2001 (R. 34, 40). The ALJ focused primarily on testimony related to 1995, which is within the closed period. The ALJ recalled that Mr. Jaquez had stated that his depression, lack of education and back injury prevented him from working, and that he felt pain in his back, neck, shoulder and leg. However, despite this pain, Mr. Jaquez indicated that he was able to do sight-seeing for three hours in 1995 at Navy Pier with his wife, but had to lay down when they arrived home. Mr. Jaquez indicated that he had health insurance at that time but was not being treated by a doctor for the pain (R. 34, 40).

Although Mr. Jaquez had not been working when he testified in 1995, he had returned to work in April 1997, and testified to that fact during the 2001 hearing. Thus, at the time of the 2001 hearing, he was testifying to historical facts that occurred during the closed period. Here, the ALJ

19

focused on the fact that Mr. Jaquez had gone back to work because his back pain had improved, and that once he went back to work, his depression improved (R. 34).

When the ALJ turned to the medical evidence, he began the review in 1990, beginning with Mr. Jaquez's first reported injury on December 13 (R. 34-35), and continuing with a summary of Mr. Jaquez's workmen's compensation litigation, the neruological examinations conducted in 1991 by Dr. Judd Jensen, and the "work capacity evaluation" performed on July 24 and 25, 1991, which showed that Mr. Jaquez had the "ability to perform light work" (R. 35, citing Ex. 19 (R. 292-306)). The ALJ then noted that "[a]nother functional evaluation was performed on the claimant on November 1, 1991" and "[i]n this evaluation, the claimant was found able to perform medium work" (*Id.*). The ALJ then noted that, following these evaluations, the claimant returned to work (in May 1992), but he was unable to perform his former job; the ALJ recognized that Mr. Jaquez re-injured himself trying to perform his former job on August 21, 1992, the beginning of the requested closed period of disability (R. 35).

The ALJ's treatment of the medical evidence during the closed period begins with the treating relationship between the claimant and Dr. Alvary. With respect to Dr. Alvary's reports, the ALJ focused on the following points:

1.    Dr. Alvary did not report any significant neurological abnormalities;

2.    Dr. Alvary completed work release forms for Mr. Jaquez. Although the evidence, as indicated, indicates that Dr. Alvary completed three work release forms for Mr. Jaquez, dated August 10, 1992, August 24, 1992, and July 9, 1993, the ALJ only focused on two of them – the August 10 and July 9 forms. The ALJ explained that the first release, dated August 10, 1992 (immediately prior to the re-injury of August 21, 1992 and thus outside the closed period – a fact which the ALJ does not note), indicates that Mr. Jaquez was released to perform work with sedentary

restrictions.[5]  The ALJ then explains that the release dated July 9, 1993, is less than 12 months from the beginning of the requested closed period and indicates that Mr. Jaquez could perform light work.

3.  The ALJ highlighted the disparity between the July 9, 1993 work release for light work and the letter Dr. Alvary sent to Dr. Kowalsky, American's company doctor, dated July 27, 1993.  In the July 27, 1993, letter, the ALJ writes: "Dr. Alvary states that it was his opinion that the claimant could not work at all because the claimant could not put any weight on the right side of his pelvis or his right leg."

4.  With respect to Dr. Alvary's other findings, the ALJ states: "Dr. Alvary indicates that the claimant's problems stem from the sacroiliac joint, but he does not offer a specific diagnosis or explain the pathology of the pain.  Dr. Alvary also states that he does not believe that the claimant was exaggerating his symptoms."

5.  The ALJ then notes that he checked to see if Dr. Alvary was listed in the AMA's Directory of Physicians, 36th edition, and found that he was not listed as a physician in Illinois.

(R. 35-36).  The ALJ concluded that, although he was Mr. Jaquez's treating physician, Dr. Alvary had failed to demonstrate any objective testing that revealed "any significant pathology to explain the claimant's complaints of severe back and leg pain."  Moreover, the ALJ concluded that Dr. Alvary's reports had actually released the claimant to either sedentary or light work "within 12 months from the alleged onset date of disability" (R. 36).

Next, the ALJ reviewed the report of the SSA consulting physician, Dr. Patel.  The ALJ's main observations from this report were that Dr. Patel believed Mr. Jaquez, when unobserved, walked without the use of any assisted devices, but when he was observed, he walked with a stiff-legged limp (R. 36, citing Ex. 22).  The ALJ also noted that Dr. Patel believed that Mr. Jaquez voluntarily stiffened his legs and back when asked to perform range of movement motions (R. 36).

---

[5]Mr. Jaquez did not follow this advice, reinjured himself on August 21, and received treatment by Dr. Alvary on August 24, 1992, at which time Dr. Alvary sent American a form indicating that Mr. Jaquez could perform "no work" (R. 493).  This is the release the ALJ does not mention.

The ALJ concluded from Dr. Patel's report that Mr. Jaquez did not show any physical abnormalities, and that Mr. Jaquez was making an "intentional effort to exaggerate his symptoms" (R.36).

Finally, the ALJ discussed the report of Mr. Regan. The ALJ rejected Mr. Regan's conclusions because: (1) he is a chiropractor; and (2) the regulations do not require the ALJ to consider the findings of chiropractors unless they are needed to help understand an individual's medical condition, 20 C.F.R. § 404.1513(a); and (3) the ALJ considered Mr. Regan's findings to be based "solely on the claimant's subjective complaints" and thus were accorded "little weight," because the other medical evidence was "adequate" for the ALJ's understanding (R. 36).

Finally, the ALJ concluded that:

[t]he objective medical findings and the finding in this case that the claimant was not credible . . . lead to the conclusion that even if the claimant was given some benefit of the doubt with respect to his alleged back pain, he would still have been able to perform a full range of either light or sedentary work at all times relevant to this decision. As a result of this residual functional capacity, the applicable medical-vocational rules would direct that the claimant be found not disabled.

(R. 36-37). Thus, with respect to Mr. Jaquez's physical impairments, the ALJ found that he was not disabled based on his residual functional capacity, as gleaned from his treating doctor's work release forms.

The ALJ next considered Mr. Jaquez's claims of disabling depression and reviewed the relevant psychological reports from consulting physicians. The first consultation the ALJ noted was that of Dr. Elouisa Dizon. In October 1993, Dr. Dizon concluded after a single interview that the pain the claimant alleged seemed to be "much more severe than the medical findings." The second consultation the ALJ noted is dated January 9, 1995 and was performed by Dr. John Tirado. The ALJ noted that Dr. Tirado found the claimant had "mild difficulties in concentration and his affect

was dull, but not inappropriate"; his intellectual abilities were within the borderline to low average level; and that he would function "most optimally in jobs which made minimal demands on his physical problems and which were consistent with his vocational attitude and capacity for learning" (R. 37).

The ALJ then focused on the reports of Dr. Polina Shvarts, a psychiatrist at the DuPage County Health Center ("DCHC").[6] The ALJ stated that claimant went to see Dr. Shvarts on May 2, 1995 (R. 37-38), but Dr. Shvarts's first report is dated July 28, 1995, and is a follow-up report to those issued by other DCHC psychologists (R. 407 (Ex. 41, 1-4)). The ALJ noted from the July 1995 follow-up, that Dr. Shvarts diagnosed Mr. Jaquez with major depression without any psychotic features (R. 38). Then there are two form reports issued by Dr. Shvarts in October 1995: the Psychiatric Review Technique Form ("PRT") and the "Mental Residual Functional Capacity Assessment" ("MRFC" Assessment) (R. 430-442). The ALJ identified the inconsistencies in Dr. Shvarts's statements in the PRT form (Ex. 49), indicating marked limitations that would not last 12 months, versus the MRFC Assessment (Ex. 50), indicating that Mr. Jaquez did not have any areas of limited functioning. The ALJ then discussed the letter from Dr. Shvarts to Mr. Jaquez's attorney in late 1996, stating that Dr. Shvarts's assessments were based solely on the claimant's subjective complaints and that she was unable to make a complete mental assessment of Mr. Jaquez (Ex. 53).

Finally, the ALJ addressed the psychological evaluation of Dr. Kerr. The ALJ observed that Dr. Kerr diagnosed depression and a pain disorder, using the terms affective and somatoform disorder, respectively. The ALJ stated that Dr. Kerr believed these disorders resulted in limitations

---

[6]Although Dr. Shvarts saw Mr. Jaquez in a follow-up session to the initial intake session with Dr. Hauser, the ALJ does not make any comments regarding Dr. Hauser's report, nor any of the other psychiatrists who examined claimant at DCHC.

which caused moderate to marked restrictions in Mr. Jaquez's daily activities and social functioning. The ALJ also acknowledged that Dr. Kerr believed the "intensity and persistence of the pain which the claimant alleged" would render him unable "to perform basic work activities until his chronic pain was successfully treated" (R. 38). The ALJ concluded that Dr. Kerr's observations were "dependent largely upon the claimant's subjective complaints of severe pain" (R. 38). In reaching that conclusion, the ALJ did not address or acknowledge the psychological testing that had been administered to Mr. Jaquez.

The ALJ then found the claimant not credible, the subjective complaints of pain exaggerated, and the reports of doctors based on these exaggerated complaints without weight (R. 38-39). The ALJ further concluded that "it cannot be found . . . that the record supports a finding that the claimant has been significantly limited at any time as a result of any mental disorders":

> even giving the claimant the benefit of the doubt with respect to his alleged depression . . . the evidence does not show that he would be precluded from all basic work activities in the sedentary or light categories as a result of this alleged impairment. At best, he would be limited to simple, unskilled work as a result of these complaints.

(R. 39).

Next, the ALJ considered the effect of Social Security Ruling 96-7p and Regulation § 404.1529 in determining whether Mr. Jaquez had any functional limitations on his RFC. The ALJ found none, based the lack of credible subjective complaints. Specifically, the ALJ found the complaints of pain not credible given the claimant's description of "rather unrestricted daily activities"; a lack of any significant side effects from medications; and physician and psychiatrist assessments that Mr. Jaquez exaggerated his physical and psycho-emotional complaints of pain (R. 41-42).

24

Having found that Mr. Jaquez had the RFC to perform light or sedentary work, the ALJ moved to Steps 4 and 5 of the sequential evaluation. There he found at Step 4 that Mr. Jaquez could not perform his past relevant work as an airline maintenance worker, bartender, warehouse clerk or commodities runner, since the least demanding exertional requirements of these jobs exceeded light work and/or the need to comprehend complex job instructions. At Step 5, the ALJ found that the claimant could perform "the full range of light and sedentary work" and thus "Medical-Vocational Rules 202.17 and 201.24 would apply and would direct a finding of not disabled" (R. 42). However, because the ALJ found that Mr. Jaquez had additional limitations not contemplated by the MV Rules, those Rules were used only as a framework for the decision to deny benefits; instead, the ALJ called a vocational expert to the hearing (as indicated). In denying benefits, the ALJ relied upon the VE's testimony that Mr. Jaquez could perform the jobs of packaging, sorting assembly work, and machine operator and that such jobs existed in the Chicago Metropolitan area in significant numbers (R. 42).

## IV.

Based on the evidence summarized above, we move now to an analysis of the ALJ's determination. We begin with the relevant legal standards.

### A.

To establish a "disability" under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A)(2004). A claimant must demonstrate that her impairments prevent her from performing not only her past work, but also

25

any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A). The social security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520 (2004). Under this test, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520; *see also Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir.1992). A finding of disability requires an affirmative answer at either Step 3 or 5. A negative answer at any step other than Step 3 precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.*

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, re-weigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994). The Court must accept the findings of fact which are supported by "substantial evidence" (42 U.S.C. §§ 405(g) (2004)), defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quotations omitted). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir.1990); *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir.1989) (the ALJ has the authority to assess medical evidence and

26

give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Sec'y of Health and Human Services*, 969 F.2d 534, 538 (7th Cir.1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir.1986) (per curiam).

That said, the Commissioner (or ALJ) is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence, and may not select and discuss only that evidence which favors his or her ultimate conclusion. See *Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id; see also Young*, 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See*, e.g., *Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir.2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.2000)). This is especially true regarding credibility determinations, since both the case law and the regulations require an ALJ to minimally articulate the specific reasons for the credibility finding. *Zurawski*, 245 F.3d at 887. Specific reasons are required so that the reviewing Court can ultimately assess whether the ALJ's determination was supported by substantial evidence or, if not, was "patently wrong." *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.2000)).

The ALJ denied benefits sought by Mr. Jaquez based on both physical and psychological disabilities for a closed period: August 21, 1992 through April 7, 1997. The Court finds that the

27

ALJ's decision denying benefits fails to address relevant and material evidence of claimant's alleged psychological disabilities, and therefore must be remanded for further proceedings.

**A.**

Much of the psychological evidence of depression is what the ALJ says it is: the reports diagnose Mr. Jaquez as having major depression without psychotic features; indicate he is on medication, without significant side effects; and contain various opinions that Mr. Jaquez exaggerates the extent of his pain. Although Mr. Jaquez was not seen by any of the mental health professionals more than once, with the exception of Dr. Shvarts, the psychological reports are fairly consistent in this regard. The reports are also fairly consistent in the work-related limitations they highlight (*i.e.,* impairments related to Mr. Jaquez's ability to concentrate and to remember and understand anything but the most simple instructions). The ALJ acknowledged this fact and added these additional limitations to his RFC finding.

So far so good. But, then the ALJ comes to Dr. Kerr's report, dated November 10, 1995 – the last report issued before the disability insurance status date expired on December 31, 1995. The ALJ acknowledged Dr. Kerr's opinion that Mr. Jaquez cannot work because of the "intensity and persistence" of his pain, and that this pain would be chronic until successfully treated, resulting in moderate to marked limitations of various kinds (R. 38-39). From that acknowledgment, the ALJ's treatment of Dr. Kerr's report suffers from at least two serious deficiencies which warrant remand.

*First,* the ALJ failed to address Dr. Kerr's statement that Mr. Jaquez's psychological condition, in his opinion, met or equaled not one but two different listings: Listings 12.04 (Affective Disorders) and 12.07 (Somatoform Disorders). Although Dr. Kerr was not a treating psychiatrist, and his opinion is therefore not entitled to controlling weight (*e.g.,* he, in fact, was engaged by Mr.

Jaquez's attorney), the fact that the ALJ completely ignored and did not mention at all that Dr. Kerr had found impairments of listing-level severity is of great concern to this Court. While it is well-established that the ALJ need not discuss every piece of relevant or potentially relevant evidence in the record, the Kerr report was specifically raised and highlighted by Mr. Jaquez's attorney at the administrative hearing, and was discussed by the ALJ. But, Dr. Kerr's statements concerning the listings were not addressed, and the ALJ offers no reason for failing to do so.

There appears to be no dispute about Dr. Kerr's *bona fides* as a psychologist, as he is used by the government as an ME in social security cases. It would seem that from this experience, Dr. Kerr would be familiar with the Listings, and thus have a basis to address the listings – as the ALJ asked the ME in this case, Dr. Newman, to do (R. 102). In any event, the fact that Dr. Kerr found psychological impairments of listing-level severity was significant, and cannot be rejected without explanation. *See, e.g., Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). The ALJ was not entitled simply to ignore that evidence.

*Second*, the ALJ's statement that "the report from Dr. Kerr is dependent largely upon the claimant's subjective complaints of severe pain" (R. 38) does not accurately reflect the substance of Dr. Kerr's report. Indeed, Dr. Kerr performed a series of objective tests on Mr. Jaquez, and on one he measured the validity of Mr. Jaquez's responses against objective criteria, the MMPI-2, and specifically found that:

> [i]n interpreting the MMPI-2 results, attention must first be directed to the validity scales which serve as a frame of reference in interpreting the clinical scales. Result-wise, the validity indicators were within the normal range, although his F score was slightly raised, but this does not invalidate the test. Interpretively this meant that he made no conscious attempt to distort or to respond deviantly to the test statements

and that therefore the clinical scales could be interpreted as reliably and validly reflecting his present level of personality-functioning.

(R. 514).

Thus, contrary to the ALJ's statement, Dr. Kerr's findings were not based "largely" on Mr. Jaquez's subjective complaints. Dr. Kerr's report was based on some objective measurements, and some having to do with credibility. And those objective findings deserved at least some acknowledgment, with an express reason for their rejection based on other objective medical evidence. Instead, the ALJ incorrectly characterized Dr. Kerr's report as being based largely on Mr. Jaquez's subjective complaints, and then based on that incorrect characterization, rejected Dr. Kerr's conclusions because the ALJ considered Mr. Jaquez's complaints not to be credible. However, the ALJ was required to address the report Dr. Kerr actually wrote, without selectively excising certain portions.

In making these observations, we do not mean to say that the ALJ was required to accept Dr. Kerr's assessment without question or analysis. However, since no other mental health professional reviewed all of the data available to Dr. Kerr, if the ALJ was uncertain that the psychometric data indicated that which was reported by Dr. Kerr, he could have called another expert pursuant to SSR 96-2p (allowing ALJ to call experts for clarification).[7] Although the ALJ is given great deference in his credibility determinations on appeal, that deference does not extend to allowing an ALJ to reject a medical opinion by the simple expedient of ignoring the objective criteria which formed a basis for it.

---

[7] Dr. Newman, the ME who did testify, was an orthopedic surgeon (R. 61). He reviewed only the medical evidence related to Mr. Jaquez's claim of disability based upon his back sprain, not his depression.

30

These errors in handling Dr. Kerr's report plainly implicated the Step 5 analysis. The ALJ relied on the VE's testimony to find that Mr. Jaquez could perform light and sedentary work in the Chicago area and that jobs in these categories, with the additional limitations posed by the ALJ, existed in significant numbers. That VE's opinion did not account for the limitations found by Dr. Kerr. On cross-examination, the VE testified that if, as Dr. Kerr found, Mr. Jaquez was markedly limited in the "[a]bility to understand and remember detailed" instructions and "maintain attention and concentration for extended periods" and "perform activities within a schedule" then "that would preclude all substantial gainful activity" and/or it would reduce the types of jobs he could perform (R. 111-113). Thus, acceptance of the limitations found by Dr. Kerr may have resulted in a finding of disability.

**B.**

Having found that a remand is required as a result of the ALJ's failure to properly address the Kerr report concerning a mental disability, we need not address the question of whether there are other errors that independently would require a remand. That said, we briefly address two other points that should be considered on remand.

**1.**

A cornerstone to the ALJ's finding that Mr. Jaquez did not suffer any disability was his complete rejection of the July 27, 1993 opinion of Mr. Jaquez's treating physician, Dr. Alvary, that Mr. Jaquez was disabled. In so rejecting that opinion, the ALJ noted that less than three weeks earlier, on July 9, 1993, Dr. Alvary had released Mr. Jaquez to perform light work. The ALJ pointed out not only the unexplained inconsistency between these two opinions, but also noted that the July 9, 1993 release to work showed that Mr. Jaquez was not unable to perform work for more than

12 months (measured from his alleged onset date of August 21, 1992), which would be fatal to his claim of disability.

One question for the ALJ to address on remand is how much weight should be given to the July 9, 1993 form (which released Mr. Jaquez for light-duty work), as opposed to the July 27, 1993 letter finding Mr. Jaquez unable to perform any work. In his 2002 decision, the ALJ completely discounted the July 27, 1993 opinion. On remand, the ALJ should consider how all of the medical evidence of record stacks up against these two conflicting opinions, and should consider whether additional medical evidence on Mr. Jaquez's physical disability claim – including any clarification from Dr. Alvary – would assist the ALJ's consideration.[8] In addition, the ALJ should take care to fairly consider all of the findings that Dr. Alvary made, and not only those that support one conclusion or another.[9]

**2.**

As we noted in the procedural history, the ALJ's opinion came at the conclusion of a proceeding on remand from the Appeals Council. That remand was necessitated by a loss – through

---

[8]One piece of evidence to which the ALJ accorded little weight was the report of Mr. Regan, who is a chiropractor. The regulations do not require an ALJ to consider the findings of chiropractors, unless they are needed to help understand an individual's condition. 20 C.F.R. § 404.1513(a). However, Mr. Regan's findings appear consistent with Dr. Alvary's conclusions of a disability, and thus on remand, the ALJ should consider afresh what weight, if any, to give to Mr. Regan's findings. Moreover, to the extent the ALJ discounted Dr. Alvary's opinions because he was not found in a directory of Illinois physicians (R. 35-36), on remand the ALJ should not do so without explaining the significance of that absence, and whether Dr. Alvary was found in that directory in 1992-93 when he treated Mr. Jaquez.

[9]We have some concern that the ALJ did not in all instances accurately state the findings that Dr. Alvary made. For instance, the ALJ stated that "Dr. Alvary indicates that the claimant's problems stem from the sacroiliac joint, but he does not offer a specific diagnosis or explain the pathology of pain" (R. 35). But, in his July 27, 1993 letter, Dr. Alvary described the structure of the sacroiliac joint; the fact that it is held together by ligaments and not muscles; that stretch-injuries to the muscle cause them to become incompetent, and to heal in that fashion; and the resulting instability is the source of the pain and dysfunction (R. 500-01).

no fault of the ALJ – of the hearing tape from the original proceeding. In remanding the case, the Appeals Council vacated the 1996 decision, and directed the ALJ to hold a *de novo* hearing (R. 576).

Nonetheless, in his July 2, 2002 opinion, the ALJ specifically incorporated by reference the vacated 1996 decision he had written, and referred to various parts of it throughout the course of his 2002 decision. In doing so, the ALJ compromised the very purpose of the *de novo* hearing ordered by the Appeals Council. The absence of the hearing tape undermined the ability of the Appeals Council to conduct an intelligent review of the ALJ's 1996 decision, and in particular, the credibility determinations it contained. To incorporate into his 2002 decision an earlier decision that the Appeals Council felt could not be adequately reviewed, and therefore vacated, defeats the purposes of a *de novo* hearing. Accordingly, on remand, the ALJ should not incorporate or give consideration to the 1996 decision (or portions of the 2002 decision that are based on the 1996 decision).

## CONCLUSION

The Court, having carefully reviewed the ALJ's decision and the entire record, therefore respectfully recommends that the presiding district judge grant Mr. Jaquez's motion for summary judgment (doc. # 10), deny the Commissioner's cross motion for summary judgment (doc. # 14), and remand this case to the Social Security Administration, pursuant to Sentence 4 of 42 U.S.C. § 405(g), for further proceedings consistent with this recommendation. The Court further recommends that a new ALJ be assigned to the case on remand, to ensure a fresh consideration of the evidence uncolored by the proceedings that led to the 1996 opinion. Of course, we express no view as to the correct determination on remand.

Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file

objections with the district court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. *See Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538, 539 (7th Cir. 1986).

All matters related to this referral having been completed, the Court therefore terminates this referral.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: January 25, 2005**